Tim Cook AKBN 9007048
Cook & Associates
3901 Taiga Drive
Anchorage, AK  99516
Phone: 907-336-5291
Fax: 907-336-5292
tcook@acsalaska.net
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

| | |
|---|---|
| HAZEL CRAWFORD ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES OF AMERICA ) <br> ) <br> Defendant. ) <br> ) | **Civil Case No.: F03-0040 Civ (RRB)** <br><br> **TRIAL BRIEF** |

**Overview**

This case arises from a simple slip and fall that occurred on September 6, 2000 outside the Base Exchange at Eielson Air Force Base. Plaintiff Hazel Crawford contends that the defendant United States (Defendant) is liable for causing her injury because of:  1) defects in the reconstruction occurring when Air Force personnel removed handicapped parking; 2) failure to properly maintain the curbs and sidewalks; and, 3) failure to warn of the abnormally high curb and its deteriorated state.

As a result of the fall, Ms Crawford suffered an injury to her right ankle. That injury did not heal properly and she has endured many doctors' visits, physical therapy, three surgeries and approximately seven years of wearing either a hard cast or walking boot. In the summer of 2007 she had a third surgery that has helped her regain some of her mobility. We do not believe that there is any substantial controversy

1 regarding her injury.

2 Plaintiff intends to put on a short case that focuses primarily on liability. We intend to call the Plaintiff Hazel Crawford, Jay Smith an expert witness, and Dr. John Cullen medical doctor. We believe that based on the testimony and exhibits we will prove to the court that the United States had a duty to construct and maintain a safe walkway, and/or a duty to warn of its unsafe condition, that the United States breached those duties, and that those breaches are the proximate cause of the injury to Hazel Crawford.

**FACTS**

On September 6, 2000, Hazel Crawford left the Base Exchange (BX) of the Eielson Air Force Base carrying a small bag in her arms. After walking down the handicapped entrance ramp, she paused for a moment on the landing, just past where the railing ended, to exchange pleasantries with another shopper (Rhonda Moore). She then turned to go to her car.

As she moved to take a step down from the sidewalk, she felt the nose of the concrete curb crumble beneath her foot. That displacement of her foot left her momentarily unbalanced. She lurched forward, and not finding her footing where it was expected, she completely lost her balance and tumbled down onto the asphalt parking lot below. As she landed, Crawford heard a crack and felt immediate, searing pain in her right ankle.

**High Curb**

Rhonda Moore, a witness to the accident, gave a written statement to Air Force investigators on August 28, 2002. She described the incident as "(t)he lady stepped off the curve *(sic)* and fell into the parking lot… The curve *(sic)* that she stepped off of was a lot higher than usual. If a person wasn't paying attention to the height they could land wrong and hurt themselves." (Plaintiff's Exhibit 15: Rhonda Moore Witness Statement USAF 0000000157, emphasis added)

The fact that the curb from which Hazel Crawford fell is higher than normal was confirmed in the Air Force's "Inspection Report- Eielson AFB 02-233", dated October 2, 2002, which states, "(t)his particular curb is the front of the Colonel and Wing Commander parking slots. It is higher than a normal curb because it is on the side of the handicap access ramp." (Plaintiff's Exhibit 14, Inspection Report Eielson AFB02-233, USAF 0000000159, emphasis added)

Crawford's expert witness, Jay R. Smith, P.E. of Northern Mechanical Engineering, Inc., investigated the accident. He interviewed Crawford, reviewed various documents and blueprints, and performed an on-site inspection. It is expected that he will testify that the curb from which Hazel Crawford stepped is approximately 50% higher than a standard or "normal" curb. Further, that the curb exceeds the maximum height called for in the "As-Built" blue prints (Plaintiff's Exhibit 13, As Built Drawing: Grading Plan and Site Plan Details, EIEL 000589).

It is expected that Smith will explain that most large municipalities have a codified standard for curb heights. The rationale for this codified standard is that pedestrians have an expectation of a standard or "normal" curb height. As a result of this expectation, when a pedestrian unknowingly steps off of an unusually high curb there is a high incidence for trips, slips, or falls.

**Deterioration / No Inspection**

Because Crawford reported that the concrete crumbled beneath her foot and caused her to pitch forward this was a focus of investigation. Smith investigated the curb for deterioration. He found numerous small chips and divots on the nose of the curb. These chips and divots were not only located where Crawford fell, but were found all along the curb. Although there were many small chips and divots, there were also some very large pieces of concrete curbing that were broken, crumbling, and some areas virtually disintegrating.

This is not to imply that the area where Crawford fell was in an obvious state of failure. To the contrary, where Crawford fell the area appeared to have small chips and chinks. In a sense, it was an insidious danger because the curb appeared to be relatively intact. Smith was curious as to why the concrete was failing (by chips flaking off of the nose of the curb) at the location where Crawford fell, as well as more dramatic failure in nearby/adjacent locations.

Smith's review of government records found work requests for repair of the sidewalk and concrete stairs that were part of the BX access route where Crawford fell[1]. One work request states: "Please repair the sidewalk and steps that are falling apart in front of the Base Exchange. Concrete is falling apart. It is dangerous to walk on this, please set up to divert traffic or fix this." (Plaintiffs Exhibit 19, BASE CIVIL

---

[1] The stairway requiring repair was one of two sets of concrete stairs that give access to the BX. Plaintiff does not claim that she fell on the stairs.

1 ENGINEER WORK REQUEST, USAF 000592). Another work request states: "The edges of [concrete]
2 steps are cracked." (Plaintiffs Exhibit 18, BASE CIVIL ENGINEER WORK REQUEST, USAF 000591).
3 These work requests indicate both that the BX access route concrete was failing and that BX managers had
4 the authority and duty to urge base civil engineering to take corrective measures.

5 Smith concluded that the concrete was not failing because of mechanical impact from snow plows or
6 other mechanical snow removal techniques, since many of the areas showing failure- such as the stairs and
7 inaccessible curbage- can not be accessed by this type of equipment. It is his opinion that the concrete
8 deteriorated and failed as a result of the improper use of deicers.

9 From the Work Request's statement that the "Concrete is falling apart. It is dangerous to walk on…"
10 it can be inferred that the concrete is in an advanced state of deterioration. Since it is also unlikely that the
11 concrete failed in a rapid or "overnight" fashion it can also be inferred that that no action had been taken to
12 either repair or warn, particularly when the Work Request further states "please set up to divert
13 [pedestrian] traffic".

14 It is unclear why the United States allowed the concrete around the BX to deteriorate to such a state.
15 The Facility Manager's Guide requires periodic inspections (p. 4, section 5a) of sidewalks and parking
16 areas (p. 17, section 17 "Summer Months", Facility Manager's Guide, Plaintiff's Exhibit 20) which should
17 have detected the deteriorating condition of the concrete.

18 It appears that such inspections were not performed. During discovery Plaintiff requested copies of
19 the periodic inspection reports referred to in the Facility Manager's Guide. None were produced. (Request
20 For Production 12 at p. 12, Plaintiff's Exhibit 17, United States' Second Response to Plaintiff's Request
21 For Discovery). Had these inspections been performed it is likely that the deterioration of the concrete
22 would have been detected prior to Crawford's injury.

23

24 **Reconstruction**
25 Smith will also testify regarding the "reconstruction" of the area subsequent to the original
26 construction. The original construction was completed in 1987. At that time an "As Built" drawing
27 (Plaintiff's Exhibit 13, As Built Drawing: Grading Plan and Site Plan Details, EIEL 000589) was made. As
28 originally constructed, the area where Hazel Crawford fell was handicapped parking. However at sometime
subsequent to the original construction, the handicapped parking was moved from its original location and

1  parking for the Base Commander and Wing CC was installed in its place.

2  Based on his inspection and comparison to the "As Built" drawing, Smith will testify that he believes that the changes to the parking area was <u>not</u> simply a change of signage. From his inspection, he believes there was significant reconstruction, including concrete work, pavement alterations, etc.

Because this was a change of the accessible route for handicapped, there was a requirement that the Air Force obtain approval for a change to the accessible route from the Secretary of Defense.[2]. No such request was made. ( Request For Admission 2 at p. 3, Plaintiff's Exhibit 16, United States' Response to Plaintiff's First Request For Discovery).  Plaintiff also inquired of Defendant if it had performed any other evaluation or review of the change to handicapped parking.[3], Defendant asserted that it performed an "evaluation or review" regarding this change to handicapped parking, but then could produce no documents supporting its claim.[4] As a result, it puts in question what basis the United States used to assert that an evaluation or review had been performed. As there are no documents that detail the extent or dates of the reconstruction, the only evidence of the extent or timing of the reconstruction is from the examination by Smith.

**Character of Area**

The area where Crawford fell is a high use area and it can be anticipated that shoppers carrying parcels will be regularly transiting the area. Patrons exiting the BX are funneled to the very spot where Crawford fell. In the fall of 2000, a shopper exiting the BX could choose to go left on to a sidewalk, straight ahead and down a badly deteriorating concrete stairway, or right and down the handicapped ramp. Shoppers choosing the right hand route, as Crawford did, have hand rails along the sides of the ramp until they reach what appears to be a "normal" sidewalk. However, despite appearances, the curb at that spot is unusually high.

Crawford will testify that she had never walked that way before and that she assumed the curb was normal height. Although she was carrying a small parcel she does not believe that it obstructed her view,

---

[2] Architectural Barriers Act, 42 U.S.C. § 4151(6)
[3] In response to Plaintiff's Request for Admission 5, that there was no engineering study, analysis, or any other evaluation done to support the deletion of the handicapped parking, the United States responded that it "denies that Eielson AFB made his change without any for of review or evaluation."
[4] Defendant's Response to Plaintiff's Request for Production 11 (Plaintiff's Exhibit 17)

but she did fail to perceive that the curb was unusually high. Plaintiff's expert Smith will testify that although it is easy for a pedestrian to perceive the height of a curb when approaching from the street, it is much more difficult when approaching from the sidewalk side to perceive height because one only sees the edge of the curb in an oblique angle to the pavement, rather than its full height.

**Injury**

Crawford's injury was initially diagnosed as a strain or sprain. But over the following months and years, the injury did not heal. The pain and swelling continued as she visited doctors more than forty times in three years, participated in physical therapy, wore five different casts, and underwent three surgeries. For more than six years she could not wear a shoe on her right foot. Most of the time her foot was in either a hard cast or in a large heavy cast called a "walking boot."

The latest surgery, performed this past summer at Harborview medical center in Washington State has restored some of her mobility. In the Autumn of 2007, after she had recuperated from her latest surgery, she was able to wear a shoe oh her right foot for the first time since her injury. Today her right foot requires a shoe three sizes larger than her left.

Before her injury on EAFB, this widow of a 20-year-service military veteran was a fully functional middle-aged woman with three grown sons and a full time job. As housekeeping manager for a Valdez hotel, she earned 12 to 15 dollars per hour.

The pain and the inability to get around have turned her life upside down. She has not worked since the fall and although she did earn her GED and began college in order to obtain alternate employment, she was forced to quit after a surgery made it impossible for her to travel to classes. She can no longer participate in many of the normal activities that once gave enjoyment to her life, such as caring for her grandchildren, working in the yard, and fishing.

Her inability to work left her financially bereft and unable, until this past summer, to afford the expenses of a trip to Washington state for the medical care and surgery on her ankle. The pain and dependence on others, as well as her financial difficulties, has taken a heavy toll on her emotional state. Crawford has undergone drug therapy for depression that she attributes to these circumstances. Much of this is documented in a diary she kept for the first few years after her injury (and which she just recently rediscovered).

## ISSUES

The basis of Crawford's claim is that the design/construction of the curb was defective in that it was dangerously high; that the curb was allowed to deteriorate to a dangerous condition; and that the Defendant failed to properly warn her of the curb's dangerous height or deteriorated condition. The Defendant has previously argued that it enjoys immunity from design and construction defects because the original design and construction of the BX was performed by third party civilian contractors, and that it is immunized by Alaska's 10 year statute of repose.

**Design / Construction Immunity**

The Defendant has previously asserted that the United States is immunized against all claims for design defects because the design and construction was performed by an independent contractor. In *Chaffin v. U.S.,* 176 F.3d 1208, 1212 (9th Cir 1999), the court noted that, under Alaska law, several theories of negligence might still bind the government in a situation where the United States would otherwise escape liability because independent contractors were responsible for design, construction, and various ongoing operations at the facility in question.

One of these theories of negligence is Restatement of Torts, § 343, which imposes liability on a landowner that fails to maintain property in a safe condition. As adopted by Alaska courts: "A landowner. . .must act as a reasonable person in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden on the respective parties of avoiding the risk." See *Chaffin v. U.S*. 176 F.3 1208, 1212-1213 (9th Cir. 1999); *Webb v. City and Borough of Sitka*, 561 P.2d 731, 733 (Alaska 1977), as cited in *Moloso v. State*, 644 P.2d 205, 219 (Alaska 1982)

The government has also argued that suit is barred because of Alaska's ten-year statute of repose. AS 09.10.055 These defenses do not fly.

Alaska's ten-year statute of repose, AS 09.10.055, runs from "the last act alleged to have caused the personal injury." Therefore, while it may exclude liability for a designer or a builder that has no continuing involvement with a facility, a landowner's breach of the duty to inspect, maintain and to provide effective

1     warnings of unperceived, dangerous conditions will always fall outside the act's reach.

2     While the government's immunity argument may hold true for negligent design claims arising from
3     the <u>original</u> construction by independent contractors, the Defendant has admitted that the area where
4     Crawford fell has been altered[5], and evidence shows that the parking area, sidewalk, ramps, and signage
5     where she was injured have been significantly altered subsequent to the original construction. The extent
6     and the precise details of the reconstruction may be in controversy. However, the fact is Hazel Crawford
7     fell in the exact spot that had been reconstructed from handicapped parking to VIP parking for the Base
8     and Wing Commanders. Therefore, the immunities that the United States asserts do not apply to the
9     reconstructed area.

10    The Defendant may make assertions that the reconstruction was not substantial enough to extinguish
11    the claim of immunity. This is without merit. Not only does the court have the admissions as to the
12    alteration, as well as the evidence Crawford will present as to the extent of the reconstruction, but the
13    Defendant failed to abide by the requirement of the Architectural Barriers Act to obtain approval from the
14    Secretary of Defense when it altered the handicapped accessible route.[6]

15    Crawford is also entitled to the inference that the reconstruction was substantial and it was performed
16    by the government because the Defendant failed to produce requested records of the reconstruction.
17    Defendant asserted that it performed an "evaluation or review"[7] regarding the relocation of handicapped
18    parking, but could produce no documents supporting its claim.[8] Plaintiff requested that Defendant produce
19    any documents that evidenced the timing or parties that accomplished this reconstruction. No documents
20    were produced.[9] As a result, Crawford is entitled to the application of the adverse inference rule towards
21    the party that has either failed to produce, or destroyed, key documentation. See *Kronisch v. U.S.,* 150 F.3d
22    112, 126-130 (2nd Cir 1998); *Ritchie v. U.S.*, No. 05-16401 (9th Cir 2006). In this case, the adverse

---

[5] Defendant admits that the area was originally handicapped parking and that it was changed. Admission 4 at p. 5 of <u>United States Responses to Plaintiff's First Request for Discovery</u>, Exhibit 16.
[6] The Defendant failed to seek or obtain authorization from the Secretary of Defense for a change to accessible route as required by the Architectural Barriers Act, 42 U.S.C. § 4151(6).
[7] In response to Plaintiff's Request for Admission 5, that there was no engineering study, analysis, or any other evaluation done to support the deletion of the handicapped parking, the United States responded that it "denies that Eielson AFB made his change without any for of review or evaluation."
[8] Defendant's Response to Plaintiff's Request for Production 11 (Plaintiff's Exhibit 17)
[9] It is remarkable that the only documentary evidence the government has produced of either the original construction or subsequent reconstrucion to the facility is the February 1, 1985 "As Built" drawing.

1  inference would be that the reconstruction was substantial and was performed by government employees.

2  The Defendant relocated the handicapped parking to a more distant location and reconstructed what
3  was originally handicapped parking to accommodate the Wing and Base Commander. It appears that this
4  was done on an *ad hoc* basis. The Defendant has produced no supporting documentation, no authorization,
5  no plans, to support this change.

6  Any immunity that the government had as a result of the original construction being designed and
7  built by third party contractors was extinguished when the Defendant reconstructed the area.

### Improperly Designed / Constructed

When the Defendant undertook to relocate the handicapped parking from its original location and install VIP parking in its stead, it became responsible for designing and constructing the area in a manner that was safe for its intended purpose. That purpose included not simply making VIP parking available for the Base and Wing Commander, but providing safe ingress and egress for patrons of the Base Exchange.

By the design of the existing walkway, patrons leaving the BX through the west exit walked down a handicapped ramp. At the bottom of the ramp the hand rail ended and what appeared to be a normal sidewalk with a standard curb greeted them. For a pedestrian who desired to enter the parking area this was the first opportunity they had to step from the sidewalk into the parking area. Unfortunately at this very spot, the curb was abnormally high.

Jay Smith, Plaintiff's expert will testify that the curb at this location is approximately 50% higher than the standard or normal curb. He will explain that an abnormally high curb presents a danger to pedestrians. The Defendant knew or should have known that this was a high traffic location (due too the proximity of the BX ) and that patrons would be "funneled" to this area. It was clearly foreseeable that pedestrians would step down from the curb at this spot into the parking area.

Smith will also testify regarding the ability of pedestrians to perceive the danger of the abnormally high curb. For a pedestrian approaching the curb from the street, the height of the curb is readily apparent. Conversely for a pedestrian approaching the curb from the sidewalk side the ability to perceive its unusual height (and the inherent danger it poses) is much more difficult.  This is because viewing the curb from the sidewalk side, one only sees the edge of the curb and the pavement beyond. As a result there is little visual

data available to appreciate the height of the curb.

It was entirely foreseeable that patrons of the BX might be carrying a package (as Crawford was), leave through the west entrance, walk to the bottom of the ramp to where the hand rail ended, fail to perceive the unusual height of the curb, and step down expecting a normal height curb. In this event it is likely that the person may fall and be injured. This injury is directly traceable to the negligent design (the unusual height) of the curb.

Since the defendant was responsible for reconstructing the area, they have bear responsibility for designing and constructing in a safe and proper manner. They did not.

**Failure to Maintain**

The Defendant as the owner of property has a duty to maintain that property in a safe condition. In the instant case the Defendant failed to do so.

Crawford will testify that she felt the concrete of the curb crumble beneath her foot which caused her to lurch forward and fall. Normal concrete does not crumble under the weight of a small woman. Jay Smith Plaintiff's expert examined the area and reviewed various documents. His conclusion is that the concrete was failing. The likely cause of that failure was from the improper use of deicers.

The failure of the concrete, though obvious in certain areas, was not as obvious as in others. It is apparent from the Work Requests and from viewing some of the exhibit pictures that the in some places the concrete was literally "falling apart". Unfortunately, the failure of the concrete where Crawford fell was not as apparent, but it was just as real. In a sense, the less apparent failure created more of a danger, because for the causal observer the concrete appeared to be solid and sound.

There are two Work Requests[10] that describe the concrete as "falling apart…and dangerous". Both indicate a failure of the concrete steps and sidewalks. From the description in the Work Requests it appears that the damage is substantial, advanced, and ongoing. There is no indication that the damage was caused by a being impacted by equipment or some other sudden event. Rather it appears it is the concrete is disintegrating from exposure to deicers and freeze-thaw cycles.

From Smith's inspection, he found that much of the concrete had chips, gouges and divots. In some

---

[10] Plaintiff's Exhibits 18 and 19.

places the curbs were disintegrating. From his inspection he saw areas that would not likely be impacted by snowplows or other equipment that had chips, gouges and divots. Furthermore, stairs are normally hand shoveled and not be subjected to damage from snowplows or blowers. As a result the deterioration would not be from mechanical impact, but most likely from chemical decomposition associated with deicers. This also fits with the fact that the stairs would likely have the highest concentration of deicer use and would suffer the most degradation.

Plaintiff does not suggest she fell at the point that the concrete was most deteriorated. She asserts that deterioration of the concrete was widespread and would have been discovered if proper inspections had taken place. The deterioration of the concrete in the stairs, sidewalks and curbs could and should have been detected earlier.

The Defendant could have, and should have, known of the sidewalk's defects— the deteriorating condition of the concrete, the excessive height of the curb drop-off, and the absence of a railing along the landing area—simply by making its required monthly inspections (which it has no report of doing for the fifteen years before Crawford fell). This is easily supported by the fact that, AFTER Crawford's accident, the government made an inspection at the site where Crawford fell and readily found a "higher than normal curb".

Clearly, the government's most cursory inspection identified that defect. Therefore, according to the reasoning in *Newton*, the government is liable in negligence here, where it "reasonably should have known of the defect and had a reasonable opportunity to repair it." 872 P.2d 1213, 1218 (Alaska 1994)

The Facility Manager's Guide mandates periodic inspections[11] of both the interior and exterior of the building (even including inspecting for potholes in the parking area)[12]. Plaintiff requested production of these documents- none were produced.[13] The clear implication is that these inspections were not performed.

It is an unusual occurrence for concrete to fail beneath one's foot. Crawford had no indication that this might occur. The Defendant knew or should have known that the concrete was deteriorated. This deterioration created a dangerous condition and resulted in Hazel Crawford falling and being injured.

---

[11] Section 5b at p. 4, Facility Manager's Guide, (Plaintiff's Exhibit 20).
[12] Section 17 Summer Months, at p. 17, Facility Manager's Guide, (Plaintiff's Exhibit 20).
[13] Defendant's Response to Plaintiff's Request for Production 12, (Plaintiff's Exhibit 17)

**Duty to Warn**

As discussed above, the Defendant knew or should have known about the dangerous conditions created by the unusually high curb and of the deteriorated state of the concrete. At a minimum, it had duty to warn pedestrians like Hazel Crawford of these dangers.

The Alaska Supreme Court, in *Moloso v. State*, 644 P.2d 205, 219 (Alaska 1982), held that "(i)mplicitly included in this (landowner's) duty is the duty to warn of hidden dangers of which the entering person is unaware."

The element in Crawford's cause of action for breaches of the duty to warn which the government disputes most vigorously is whether there was a "hidden danger". Hidden dangers are alternatively described by the *Moloso* court as a "latent hazardous condition" and "concealed condition". 644 P.2d 205, 219 (Alaska 1982)

In *Kremer v. Carr's Food Center*, 462 P.2d 747, 750 (Alaska 1969) the Alaska Supreme Court was confronted by a fact situation where the hazardous condition—i.e. snow and ice ruts in a parking lot—were as obvious to the injured shopper as to the store management, the Alaska Supreme Court explicitly rejected the defendant's attempt to use the obvious danger doctrine to avoid liability.

In Crawford's situation, the curb itself was obvious; however the hazard posed by the abnormal height of the curb was not. It is precisely the unperceived nature of the hazard that invokes the duty to warn.

The fact that the surface of the sidewalk was so deteriorated by age and deicers as to unexpectedly flake off was also a hidden danger. And the curb being 10 ½" high, 75% higher than normal, constitutes a hidden danger as well.

These clearly were not open and obvious dangers: one does not expect concrete to crumble beneath one's feet or curbs to be abnormally high. Both conditions were dangers that the landowner had a duty to disclose. As stated in California's *Rowland v. Christian* decision, and favorably quoted by the Alaska court in *Moloso*, "(w)hether or not the guest has a right to expect that his host will remedy dangerous conditions on his account, he should reasonably be entitled to rely upon a warning of the dangerous condition…" 443 P.2d 561, 568, as quoted in *Moloso* at 644 P.2d 205, 219

Failing to do so creates liability when one such as Hazel Crawford is injured because of that failure.

Simple measures could have been taken to alleviate or warn of the danger. For instance, the hand rail could have been extended, the pavement of the parking lot could have been built up to effectively lower the height of the curb, or the curb could have had a warning painted on it cautioning that it was a high curb. None of these would be expensive, difficult or burdensome.

**CONCLUSION**

The Defendant had duty to provide Hazel Crawford with a safe path to walk from the BX to her parked vehicle. It breached that duty because the curb that she stepped from was abnormally high and the concrete of the curb was seriously deteriorated.  This caused her to fall and be injured. As a result, the United States is liable for the injuries sustained by Hazel Crawford.

Dated: _2/26/08_____          ____*s/s Tim Cook*_____

                                        Tim Cook, Attorney for Plaintiff
                                        Alaska Bar No. 9007048

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document  was served electronically to the following:

Susan Lindquist
Assistant U.S. Attorney
Federal Building and U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska 99513