IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| HAZEL CRAWFORD,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　Defendant. | Case No. 4:03-cv-0040-RRB<br><br>**MEMORANDUM DECISION** |

I.　　INTRODUCTION

　　　　Before the Court is Hazel L. Crawford, Plaintiff, with a claim filed pursuant to the Federal Tort Claims Act and arising out of an incident that occurred on September 6, 2000, at Eielson Air Force Base, Alaska.  Plaintiff injured her right ankle after leaving the Base Exchange and while stepping from a ramp leading to the parking lot.  Plaintiff contends that this injury was due to the negligence of the United States Air Force and, more specifically, due to: (1) defects in reconstruction occurring when

the Air Force removed handicapped parking; (2) failure to properly maintain the curbs and sidewalks; and (3) failure to warn of the abnormally high curb and its deteriorated state.

The Defendant, United States Air Force, denies responsibility for Plaintiff's injury and contends that: (1) there was no reconstruction performed when the handicapped parking location was moved; (2) the curbs and sidewalks were concrete and needed no maintenance; and (3) the curb in question was not too high nor was it deteriorated.  Defendant further argues that it had no notice of any alleged defect and therefore no duty to warn.

The applicable law relevant hereto was set out by the parties in their previous pleadings and is not in serious contention.  The trial, therefore, proceeded to address the factual disputes between the parties.

## II. TRIAL

Trial commenced on March 3, 2008.  Plaintiff was in attendance and was represented by counsel, Tim Cook.  The United States was represented by AUSA Susan Lundquist.  The Court sets forth below a rough overview of the testimony presented at trial.

Plaintiff was the first witness and testified in detail as to how she recalled the accident in question to have occurred. Plaintiff testified that she was leaving the Base Exchange after having done some shopping.  The weather was dry and no debris

cluttered the sidewalk. Plaintiff was generally in good health. As Plaintiff stepped from the curb onto the parking lot, Plaintiff recalls that the concrete crumbled under her right foot causing her to fall forward into the parking lot. She was wearing a low cut tennis shoe at the time. Although it is unclear how precisely Plaintiff's right foot was injured, i.e. the mechanism of the injury, Plaintiff landed on her left side and her left hand hit the ground. She immediately experienced pain in her right ankle. Plaintiff had never previously stepped from the curb at that location. After the accident, Plaintiff looked at the curb and saw where the concrete broke and saw pieces of concrete on the ground. She does not recall seeing the reserved parking sign at the scene. Plaintiff remained on the ground until an ambulance arrived and took her to the emergency room on Base. Her right foot became swollen and her shoe was cut off.

      Plaintiff's ankle was placed in an ace bandage at the Base Hospital and she was given crutches and some pain medication. Several weeks after returning to her home in Valdez, Plaintiff saw her family physician who took x-rays and referred Plaintiff to Dr. Dingeman, an orthopedic surgeon in Fairbanks. Dr. Dingeman placed Plaintiff in a hard cast that she wore for six weeks. Thereafter, a second cast was placed on Plaintiff's ankle with no improvement. Plaintiff continued to experience pain and swelling

continuing into March of 2001. She remained on crutches and began to develop sores under her arms from the crutches, as well as depression due to her incapacity. As time passed, Plaintiff's medical bills began to add up, which contributed to her depression.

After Plaintiff's injury she quit work and began taking college classes but was unable to complete here course work due to her ankle condition.

On June 4, 2001, Plaintiff underwent her first surgery in this matter and was placed back in a cast. Her pain, however, continued with no apparent improvement in her condition. Plaintiff continued to experience pain and depression and was embarrassed by the cast and ankle boot. Her depression led her to intentionally burn herself with her cigarettes and placed a strain on her relationship with her partner. The pain and depression continued into 2002. On January 17, 2002, Plaintiff learned that she would need another surgery. This second surgery was performed by Dr. Dingeman and took place in October of 2002, but again, was not successful.

Plaintiff subsequently traveled to Anchorage for a second opinion, which led to a visit at the Foot and Ankle Institute at Harborview Medical Center in Seattle, Washington, and a recommendation for another surgery. This final surgery was delayed until June of 2007 because of Plaintiff's lack of funds. This

surgery was successful and Plaintiff is now able to walk and has been able to wear a regular shoe on her right foot since December of 2007. Plaintiff's right foot still bothers her. Plaintiff still has swelling in the back of the foot, with no feeling in the back of her heel, and still feels pain with extensive standing or sitting. Plaintiff currently has restless leg syndrome and knee difficulties in her left leg, which she believes is a result of the additional weight placed on her left leg while the right foot was disabled.

Plaintiff has still not returned to work. Prior to her injury, Plaintiff had just begun working as a cashier in a food store making $8 an hour. Previous to this she was the house keeping manager for Westmark in Valdez making $12 an hour before the hotel closed. Plaintiff believes that her injury currently renders her unemployable.

Plaintiff has incurred $50,000 to $70,000 in medical expenses, plus between $16,000 and $20,000 in incidental expenses, but provided the Court with no documents to support these claims. She doesn't have exact figures. Approximately 75% of her medical bills were paid by insurance. Plaintiff has had three surgeries and wore numerous casts and prosthetic devices since her injury.

Before her injuries, Plaintiff enjoyed bicycle riding, fishing, gardening, dancing, etc. Since her surgery, Plaintiff has

now been able to do some of these things again, but she cannot yet dance.

Plaintiff contends that this injury has deprived her of her health, her money, her dignity, and her respect, and has taken away her faith in other people. Plaintiff believes that she is entitled to $2 million for this injury.

On cross-examination, it was established that since the incident Plaintiff was able to travel to Italy in 2002 to assist with the care of her grandchild. Upon returning to Valdez she also babysat another grandchild. Plaintiff didn't request pain medication during any of this time because of her concern that it might be addicting.

Jay Richard Smith next testified on behalf of Plaintiff. He is a forensic engineer with a Bachelor of Science Degree in Mechanical Engineering. He is a Registered Professional Engineer who regularly performs accident investigations and who was retained by Plaintiff in this matter. Mr. Smith conducted an investigation in 2005 regarding Plaintiff's fall and prepared a report. It is Mr. Smith's opinion that Plaintiff fell while stepping off the curb after a portion of the curb gave way and caused Plaintiff to fall. Mr. Smith testified that the height of the curb prevented Plaintiff from catching herself once having lost her balance and that the

lack of barriers or pedestrian warnings contributed to the fall as well.

   The walkway height at the place Mr. Smith understood Plaintiff to have fallen was 9-1/4 inches to 10-1/2 inches above the parking lot surface.  Standard curb heights in the city of Anchorage are 6 inches.  According to Mr. Smith, this increased height prevented Plaintiff from catching herself after stepping off the curb.  The height difference throws one's senses off.  Mr. Smith believes that the typical person would view the curb in question as too high and would not expect a 10-inch curb.  He further believes that the removal of the curb stops contributed to the fall by removing a barrier or indicator of the difference in elevation.

   Plaintiff fell in a high traffic area.  The Air Force could have continued the guardrail down, put another step in the parking lot, or put a sign up.  The concrete appears to have been deteriorated as evidenced by work requests for stairs and sidewalks in the vicinity a year and half after this incident.  Also, the military failed to conduct regular inspections of sidewalks and curbs.  The deteriorated concrete and height of curb would have been visible upon inspection.

   On cross-examination, it was established that Mr Smith doesn't routinely design or build parking lots or handicap ramps;

that curbs he is aware of are not curbs for handicap ramps; that there are no handicap standards for city of Fairbanks near which Eielson Air Force Base is located; that concrete maintenance requires keeping water off it; that he has no knowledge about use of de-icers at Eielson Air Force Base; and that the X on the as-builts indicates that the original design was deleted. Mr. Smith's conclusion that the Air Force failed to regularly inspect the area in question is based on the lack of records for such inspections.

  Dr. John S. Cullen next testified on behalf of Plaintiff. Dr. Cullen is a physician licensed to practice medicine in the State of Alaska, specializing in rural family medicine in Valdez, Alaska. Dr. Cullen initially treated Plaintiff for her right ankle injury in the fall of 2000, and ultimately referred her to Dr. Dingeman. Subsequently, due to a lack of improvement, Dr. Cullen referred Plaintiff to an Anchorage specialist, who in turn referred her to the physician in Seattle who, in October of 2003, recommended surgery to lengthen Plaintiff's Achilles tendon. Plaintiff put off this surgery, however, until 2007 when she underwent surgery in Seattle. This surgery was successful in reducing Plaintiff's pain and permitted Plaintiff to walk without a cast or prosthetic device, although it did not lead to complete recovery. Plaintiff still has some pain in her ankle which is likely to continue. Plaintiff does require different shoe sizes,

but will likely do fairly well. Plaintiff also complained of problems with her left leg and restless leg syndrome, which may be caused by the right ankle injury. Plaintiff will likely continue to have some ankle pain in the future and will have difficulty with jobs that require walking or heavy labor, although not more sedentary jobs. Dr. Cullen offered no testimony with regard to medical expenses.

      The Government's first witness was Jeff Putman, Deputy Base Civil Engineer at Eielson Air Force Base, a Registered Civil Engineer residing in North Pole, Alaska. Mr. Putman sought records that might exist regarding upgrades or changes to the curbs and/or parking lot in question or work orders relating to the exterior of the Base Exchange. His search resulted in the discovery of exhibits 18 and 19 but no other records or drawings.

      Mr. Putman measured the curb height at the apparent location of the fall at 9-1/4 inches. There were no records of prior falls at this location. Mr. Putman was unaware of any major construction or reconstruction at the area in question, other than the removal of handicap signs. Mr. Putman did not view the removal or placement of signs as significant reconstruction. Mr. Putman testified that records of inspections were not kept if they did not turn up problems or need for work to be done. Mr. Putman testified that the government did use de-icers on sidewalks.

The Government next called William Kim, the architect who prepared the "as-builts" for the curb/side walk project in dispute. Mr. Kim testified that the curb height was 6" to 10" above the ground. Mr. Kim was unaware of any codes for curb heights that might have applied to this project. Upon cross-examination, Mr. Kim testified concerning the elevation of the pavement at the site in question and his belief that it sloped away form the curb based on the "as-builts." Mr. Kim has not been on the site.

The Government next called Linda Borden, a Base Exchange employee, who worked at the Base Exchange during the years 1983-1985, 1990-1991, and 1999 to 2001. Ms. Borden was acquainted with Plaintiff prior to the fall and recalls the incident of September 6, 2000. Ms. Borden, upon hearing of the fall, went to the parking lot and found Plaintiff sitting on the ground. Plaintiff told Ms. Borden that she fell when she "went to step from the curb and her heel caught on the edge, she twisted her ankle, and she fell."

Ms. Borden has stepped off that curb a lot over the years and had never experienced any problems. Ms. Borden was unaware of any construction taking place on the curb in question and never heard of anyone other than Plaintiff falling at that location.

**III. BACKGROUND**

Prior to the trial in this matter, considerable motion practice was transacted. On January 26, 2006, this Court granted partial summary judgment in favor of Defendant, holding that the United States was not liable for any injuries that resulted from the original design or construction of the curb and walkway in question.

On June 15, 2006, a second motion for summary judgment was granted. This motion, however, was dispositive of the entire case, for the Court found that the curb in question was not dangerous and did not constitute a hazard that would give rise to a duty to warn. Plaintiff appealed the Court's orders of summary judgment to the Ninth Circuit Court of Appeals which Court, in a decision filed and entered September 7, 2007, reversed and remanded the matter to this Court to determine more specifically: (1) whether the sidewalk and ramp where Plaintiff was injured were altered subsequent to their original construction, such that the Government would not be immunized from liability in this case; and (2) whether the height of the curb presented a hidden danger of which the Government had a duty to warn. The trial of this matter was conducted to address both the aforesaid issues.

**IV.   FINDINGS OF FACT AND CONCLUSIONS OF LAW**

No credible evidence was presented at the trial of this matter that the sidewalk and ramp where Plaintiff was injured were altered subsequent to there initial construction in roughly 1983. No witnesses were presented to testify of such alteration, no plans, photographs, or contracts were presented of such an alteration, and nothing about the physical layout of the area suggests that such an alteration was made.  Plaintiff's speculation that the "as-builts" suggest that the area was initially constructed different than its current configuration is merely unsupported conjecture, and Plaintiff's argument that the removal and placement of signs in the area was sufficient to constitute such an alteration is not convincing.  The movement of a parking sign cannot be considered to be a "change to a building or its permanent fixtures."  Such changes, according to witness Putman, do not require written specifications and are not the type of thing that would require a re-engineering study.  Certainly this makes sense, for there are any number of reasons why a sign might be moved or replaced.  It would be highly unreasonable to expect that such actions would require re-engineering of the entire area. This would apply as well to the relocation of movable parking blocks or bumpers, although no convincing evidence was presented that such bumpers ever existed in the area.

MEMORANDUM DECISION - 12
4:03-CV-0040-RRB

The Court is also unable to conclude the height of the curb constituted a hidden danger against which the Government was required to warn. The curb, at the sight of the fall, was roughly 9 to 10 inches above the asphalt. While this might appear higher to some then normal, it is not in violation of any building or safety codes. The walkway appears, by the photographs, to be following the natural contour of the land and does not stand out as a dangerous condition. And of particular significance, no evidence was presented at trial of any falls or complaints about the area in question during the roughly 13 years that it existed prior to Plaintiff's fall or at any time since. This, despite the fact that Plaintiff's expert described the walkway as a high traffic area. The Government had no reason whatsoever to believe that a dangerous condition existed at this location.

The sidewalk itself, at the site of this incident, was not dangerous or in disrepair. The pock marks Plaintiff refers to in the concrete are typical of sidewalks throughout the state. Moreover, the Court has been unable to imagine the mechanics of Plaintiff's fall. If the concrete really crumbled under her foot, as she testified, Plaintiff would have had to have been balancing on the edge of the curb, which is unlikely. Further, the only missing concrete, as depicted in the vicinity of the fall in photographs taken five years afterwards, is minimal and not likely

to have caused Plaintiff's fall.  The Court, therefore, suspects that the version of the incident as Plaintiff first reported to witness Borden is more accurate.  Plaintiff likely caught her heel on the edge of the curb, likely her left foot, stepped down hard, twisted her right ankle, and fell to the ground.  Certainly this was a very unfortunate accident and one that caused Plaintiff significant injury. The accident, however, was not due to the negligence of the Government.

**V.   JUDGMENT**

Having resolved the factual disputes in favor of Defendant, judgment  is hereby rendered in favor of the Government. Plaintiff's claims are **DISMISSED** with prejudice.

ENTERED this 17th day of April, 2008.

S/RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE